**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X          **05 CV 3324 (NG)**
**ECSON CAIMITE,**

**Petitioner,**

    **-against-**                                        <u>**OPINION**</u>

**SUPERINTENDENT BRIAN FISCHER,**

**Superintendent.**

---------------------------------------------------------------X

**GERSHON, United States District Judge:**

    *Pro se* petitioner Ecson Caimite applies to this court under 28 U.S.C. § 2254 for a writ of habeas corpus, alleging that he is being held in custody in violation of the Constitution and laws of the United States pursuant to the judgment of a court of the State of New York. Specifically, Caimite challenges his convictions of depraved indifference murder and possession of a weapon in the third degree in connection with the shooting death of Joel Worrell. For the reasons set forth below, petitioner's application is denied.

**BACKGROUND**

    Taken in the light most favorable to the prosecution, the evidence at Caimite's trial, held in Supreme Court, Kings County (Kreindler, J.), established the following facts:

    On the evening of January 29, 2000, Caimite attended a housewarming party hosted by one of Joel Worrell's friends. Trial Transcript ("Trial Tr.") at 134. Because Caimite had not been invited to the party, Joel Worrell asked him to leave. Trial Tr. at 135-36. Later on in the evening, Caimite returned to the party, pointed a gun at Joel Worrell, and said "Yo, let's dead this right now." Trial Tr. at 141-42.

A month and a half later, on the afternoon of March 11, 2000, Caimite was drinking at a pool hall with Gerald Worrell ("Gerald"), one of Joel Worrell's nephews, and Everton Brown, one of Gerald's friends who thought of Joel Worrell ("Joel") as an uncle. Trial Tr. at 85, 98-99, 235-36, 239, 246. At some point during the afternoon, Caimite stood up to use the telephone, and Gerald went outside to smoke a cigarette. Trial Tr. at 99-103.

While Gerald was outside, Joel walked up to the pool hall, talked with Gerald briefly, and then entered the building. *Id.* After Joel entered the pool hall, he and Caimite became involved in a heated exchange during which Caimite said, "Man, you want war? You want war? I be back. I be back." Trial Tr. at 104-06. Caimite then left the pool hall heading in one direction, while Joel, followed by Gerald and a few others, walked to a friend's basement. Trial Tr. at 106-07. Joel stayed inside approximately five minutes before heading back out. Trial Tr. at 108. Shortly thereafter, Joel and Caimite's argument resumed, this time escalating into a physical confrontation on the streets near the pool hall. Trial Tr. at 41.

Dwayne Alexander first noticed Caimite and Joel's argument while standing across the street with two other people, Jamal Maule and Mark Joseph. Trial Tr. at 39. When Alexander crossed the street to try to talk Joel and Caimite out of their argument, Joel's hands were empty, and Joel was telling Caimite to take his hands out of his pockets, saying, "You think you are a bad man. You got a gun. You can't kill me. I will kill you." Trial Tr. at 41, 43, 46. As Alexander was trying to talk them out of their argument, Caimite shoved Joel and started reaching for his waist band. Trial Tr. at 46-49. When he saw Caimite reach for his waist band, Alexander started running. When he was half a block away, Alexander heard a shot fired, at which point he turned back briefly and glimpsed an empty-handed Joel attempting to grab Caimite, who appeared to have a black gun in his hand. Trial Tr. at 48-49. Alexander kept

running to the end of the block, turned around again, and saw Joel trying to get up off the ground. Trial Tr. at 50. Caimite was no longer at the scene. *Id.*

At the time of the shooting, Richard Bono, an employee of Brooklyn Union Gas, was nearby in his utility van responding to a job. Trial Tr. at 222-26. Upon hearing a gunshot, Bono checked his side-view mirror and noticed a person lying on the ground approximately three or four car lengths away. Trial Tr. at 226-29, 233. Someone dressed in dark clothing was swinging and striking at the person on the ground, and when this assailant took a few steps down the street in the direction of Bono's utility van, Bono drove away. Trial Tr. at 228-29.

Colin Hinds was also nearby at the time of the shooting. While walking with his girlfriend on the street, Hinds noticed three men, two of whom were exchanging words. Trial Tr. at 255-57, 263. Hinds kept walking past the men and heard a "pow" when he was about one hundred feet away. Trial Tr. at 263, 277. According to Hinds, he turned when he heard the "pow" and saw one of the men, a short individual who was dressed in black and who had a gun in his hands, attacking a taller man. Trial Tr. at 260, 264, 266. The taller individual did not have anything in his hands and, when the taller person fell to the ground, the shorter person pulled the taller one up by the collar. Trial Tr. at 265, 267, 271. The shorter person then held the gun over the taller person, trying to fire it again. Trial Tr. at 267, 278. When the gun failed to fire, the shorter individual used it to "snap" the taller individual in the head and then ran away. Trial Tr. at 268-69. Hinds' testimony—that the assailant wore black and was shorter than his victim— matched Alexander's testimony that the assailant, Caimite, wore a dark jacket and was shorter than his victim. Trial Tr. at 42.

At approximately 5:45 p.m., Police Officer Juan Duque responded to a radio call and observed the victim, Joel Worrell, lying face down in the street bleeding from his nose and head.

Trial Tr. at 286-87, 290, 320-21. Medical personnel pronounced Joel dead at the scene, Trial Tr. at 326, and an autopsy revealed that the cause of death was a gunshot that entered the front of the chest, severed several major blood vessels, and then exited the back of the chest. Trial Tr. at 380-81. The decedent had sustained abrasions on the right side of the nose and on the right side of the cheek, as well as behind the left ear. Trial Tr. at 387. Lacerations were present on the top of the left side of the head and near the ear on the left side of the head. Trial Tr. at 387. Fractures of the skull were consistent with being hit over the head with a gun, and the doctor who conducted the autopsy opined that at least three different impacts must have caused the three distinct lacerations that she observed. Trial Tr. at 389-90.

## PROCEDURAL HISTORY

For the above acts, Caimite was charged with Intentional Murder in the Second Degree (N.Y. PENAL LAW § 125.25[1]), Depraved Indifference Murder (N.Y. PENAL LAW § 125.25[2]), and Possession of a Weapon in the Second and Third Degrees (N.Y. PENAL LAW §§ 265.03[2], 265.02[4]). Caimite's trial counsel requested that first degree manslaughter (N.Y. PENAL LAW § 125.20[1]) be charged as a lesser included offense of intentional murder and that second degree manslaughter (N.Y. PENAL LAW § 125.15) be charged as a lesser included offense of depraved indifference murder. When these requests were denied, Caimite's trial counsel then requested that the trial court instruct the jury on intentional murder only. The court denied this request and instructed the jury on intentional murder and depraved indifference murder in the alternative. Trial Tr. 425-34, 492-95. During deliberations, the jury returned a note indicating that it was deadlocked on the murder counts. After consultation with Caimite, counsel requested, and the court delivered, a limited *Allen* Charge. Trial Tr. 525-27. Thereafter, the jury returned a verdict acquitting Caimite of intentional murder and finding him guilty of depraved indifference murder

and possession of a weapon in the third degree. Pursuant to N.Y. Crim. Pro. Law § 330.30(1), Caimite moved to set aside his murder conviction, arguing that the trial court erred in failing to charge second degree manslaughter as a lesser included offense of depraved indifference murder. The trial court denied this motion and, on April 5, 2001, sentenced Caimite to concurrent terms of imprisonment of twenty years to life on the depraved indifference murder count and seven years of imprisonment on the weapons possession count.

With the assistance of appellate counsel different from his trial counsel, Caimite timely appealed his conviction to the Appellate Division, arguing that his due process rights were violated when the trial court failed to charge first degree manslaughter as a lesser included offense. The Appellate Division affirmed Caimite's conviction in a decision dated June 16, 2003, *People v. Caimite*, 306 A.D.2d 417 (2d Dept. 2003), and the Court of Appeals denied leave to appeal on July 21, 2003. *People v. Caimite*, 100 N.Y.2d 579 (2003).

On November 2, 2003, Caimite filed a *pro se* motion to vacate his conviction pursuant to N.Y. Crim. Pro. Law § 440.10, arguing that his trial counsel was ineffective. In an order dated March 8, 2004, the Supreme Court, Kings County (Dowling, J.), denied Caimite's motion to vacate, finding that his claims were procedurally barred and, in any event, meritless. Caimite filed three subsequent motions—on March 25, 2004; June 24, 2004; and July 20, 2004—seeking to reargue and renew his previous § 440 motion, all of which were denied because they did not raise any new issues. Caimite sought leave to appeal the denial of his motion to vacate and, in a Decision and Order dated April 26, 2005, the Appellate Division denied leave to appeal.

Caimite filed a petition in this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on July 6, 2005. Subsequently, Caimite requested that his petition be held in abeyance while he exhausted a claim of ineffective assistance of appellate counsel in state court. In papers

dated September 13, 2005, Caimite argued before the Appellate Division that his appellate counsel was ineffective on direct appeal for failing to argue that the evidence at trial was insufficient to support a depraved indifference murder conviction. The Appellate Division denied Caimite's motion for a writ of error *coram nobis*, finding that Caimite had not been denied the effective assistance of appellate counsel. *See People v. Caimite*, 24 A.D.3d 463 (2d Dept. 2005). In a certificate dated May 5, 2006, the New York Court of Appeals denied leave to appeal.

After the denial of his application for a writ of error *coram nobis*, Caimite refiled his petition for a writ of habeas corpus in this court. Caimite's initial petition raises (1) the same argument that appellate counsel raised on his direct appeal, that the trial court erred in failing to submit the lesser included offense of first degree manslaughter to the jury; and (2) the ineffective assistance of trial counsel claims that he previously raised in his state court motions pursuant to N.Y. Crim. Pro. Law § 440.10. Caimite's amended petition raises (3) the same ineffective assistance of appellate counsel claim that Caimite previously raised in his state court motion for a writ of error *coram nobis*.

## DISCUSSION

### I.    Standard of Review

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (1996), mandates deference to state court decisions by federal courts conducting habeas corpus review. Under its provisions, an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in the state court unless the adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established federal law, as determined by the Supreme Court, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). The habeas court must presume that the state court's determination of factual issues is correct unless the petitioner demonstrates otherwise by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The Supreme Court has held that a state court decision is "contrary to" clearly established federal law if it (1) "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent," *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), or (2) contradicts "the *holdings*, as opposed to the *dicta*, of [Supreme Court] decisions as of the time of the state-court decision." *Carey v. Musladin*, 127 S.Ct. 649, 653 (2006) (emphasis added), quoting *Williams*, 529 U.S. at 412. The Court has further held that a state court decision is "an unreasonable application of" clearly established Supreme Court precedent if, from an objective standpoint, the state court applied Supreme Court precedent unreasonably, not simply incorrectly or erroneously. *Id.* at 411. The Court of Appeals for the Second Circuit has clarified this standard, holding that "[although] some increment of incorrectness beyond error is required ... the increment need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Sellen v. Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).

## II.     Ineffective Assistance of Trial Counsel

Caimite argues that he was denied his Constitutional right to effective assistance of trial counsel because trial counsel "failed to investigate, prepare and research the law." Initial Petition, p. 8. To obtain habeas relief based on ineffective assistance of counsel, a habeas

petitioner must show (1) that his attorney's performance "fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and (2) that there is a "reasonable probability" that, but for counsel's error, the outcome would have been different. *Id.* at 694. "Constitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) *quoting Strickland*, 466 U.S. at 690. Furthermore, when "evaluating the merits of an ineffectiveness claim, an attorney's conduct should not be viewed in a vacuum, but in the context of the entire proceeding." *United States v. Wellington*, 417 F.3d 284, 288 (2d Cir. 2005).

To the extent that Caimite's claims of ineffective assistance of trial counsel are based on conduct that was apparent from the trial record, his claims are procedurally barred; Caimite did not raise these claims on direct appeal and he has shown neither that failure to hear his claim would result in a fundamental miscarriage of justice nor actual prejudice and cause for this default. *Sweet v. Bennett*, 353 F.3d 135, 139-41 (2d Cir. 2003) (finding a § 2254 habeas petitioner's claim of ineffective assistance of trial counsel procedurally barred because of appellate counsel's unjustifiable failure, despite a sufficient record, to raise this claim on direct appeal).[1] In any event, all of Caimite's ineffective assistance of counsel claims, even if they are not procedurally barred, are meritless.

---

[1]  Although the U.S. Supreme Court has held, in the context of petitions under 28 U.S.C. § 2255, that there is no procedural default for failure to raise an ineffective assistance of trial counsel claim on direct appeal, *Massaro v. United States*, 538 U.S. 500 (2003), the Second Circuit subsequently has held that procedural default rules still apply to ineffective assistance of trial counsel claims raised in § 2254 habeas petitions. *Sweet*, 353 F.3d at 140-41. (noting that "[s]ection § 2254, unlike § 2255, contains an exhaustion rule, as well as a rule requiring

### A. Counsel's performance at pretrial hearings and at trial

Caimite asserts the following ineffective assistance of trial counsel claims based on defense counsel's performance at pretrial hearings and at trial: (1) that counsel's pretrial motions to inspect and release the grand jury minutes and to dismiss the indictment based on insufficient evidence were general and not tailored to Caimite's case; (2) that counsel was ineffective for failing to have Caimite testify at trial; (3) that counsel was ineffective for requesting a limited charge under *Allen v. United States*, 164 U.S. 492 (1896), when the jury deadlocked; and (4) that counsel did not adequately support his request for a charge on lesser included offenses.

The record, however, taken as a whole, indicates that Caimite's trial counsel provided him with effective representation. Before trial, counsel filed a motion requesting a bill of particulars, discovery, suppression of all evidence obtained as a result of Caimite's allegedly unlawful arrest, suppression of statements made by Caimite to law enforcement officials, and suppression of any identifications that others made of Caimite. Defense counsel also moved to inspect grand jury minutes, moved to dismiss the indictment, and moved to preclude prosecutor's questions regarding any prior convictions or bad acts should Caimite choose to testify. Counsel appeared at pre-trial hearings at which he cross-examined all witnesses, made appropriate objections and motions, and argued that the police lacked probable cause to arrest Caimite. Transcript of March 7, 2001 Pre-trial Hearing ("Pre-Trial Hearing Tr."). At trial, counsel cross-examined witnesses effectively and delivered a cogent opening that allowed his trial strategy to unfold flexibly. Trial Tr. at 22-24. Defense counsel also made appropriate objections and motions throughout the trial; for example, defense counsel successfully objected to a detective's

---

deference to state courts, underscoring the necessity that defendants raise their claims in state courts first.") (internal citations omitted).

testimony about the recovery of a gun that had not been connected explicitly to the shooting. Trial Tr. at 356-60.   In addition, defense counsel made appropriate charge requests and sound closing arguments.  In closing, defense counsel argued that, with regard to those witnesses who had known Joel well, their close relationship with Joel had colored their recollection of events. Defense counsel pointed out inconsistencies between their testimony at trial and their earlier reports to police, arguing that, whether consciously or unconsciously, they were adding information to their stories.  Trial Tr. at 440-442.  Defense counsel further pointed out that Hinds and Bono, the only two eye witnesses who had not known Caimite before the shooting, did not try to identify Caimite in court.  Trial Tr. at 451.  In sum, defense counsel argued that Alexander was the only person who actually connected Caimite to the scene and that Alexander's testimony was not trustworthy.   Trial Tr. 442, 448.   Defense counsel pointed out that Alexander had delayed going to the police, Trial Tr. at 447, that he was biased and had a motive to fabricate his story to protect himself, Trial Tr. at 445-46, and that he had altered his story between the time that he spoke to police and the time he testified at trial.[2]  Trial Tr. at 454.

Although Caimite argues that defense counsel's pre-trial motions to release the grand jury minutes and dismiss the indictment were inadequate, the trial court's denial of these pre-trial motions does not necessarily mean that defense counsel was derelict in his duties.  Under the law as it existed at the time of Caimite's trial, there was sufficient evidence to support indicting and convicting Caimite of depraved indifference murder.   *See* Discussion *infra* Part IV.   Thus, Caimite has failed to show a "reasonable probability" that, even if trial counsel presented

---

[2] Defense counsel argued that Alexander had placed all blame on Caimite and delayed going to the police because he did not want to get in trouble for picking up the gun after the shooting and did not want to appear involved in any way.  Trial Tr. 442-47.

different arguments in support of his pre-trial motions, the trial court would have granted these applications. *Strickland*, 466 U.S. at 694. As Caimite has failed to establish a reasonable probability that the outcome of the proceedings would have been different, Caimite is not entitled to habeas relief on this basis.

Nor is Caimite entitled to habeas relief based on trial counsel's request for a limited *Allen* charge. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690-91. Faced with a deadlocked jury, trial counsel's decision, after consulting with Caimite, to request a limited *Allen* charge was a reasonable strategic decision and did not render his service constitutionally ineffective. At the time of the jury's deadlock, it was unclear how the jurors were split. In this setting, requesting that the court deliver a limited *Allen* charge, an instruction meant to encourage the jurors to continue deliberating without surrendering sincerely held beliefs, was a reasonable strategic choice, a choice that could have resulted in Caimite's acquittal. The alternatives, a hung jury or a mistrial, would have left Caimite open to retrial. Evaluating the situation without the benefit of hindsight, counsel's performance fell within the wide range of constitutionally effective assistance.

Nor is Caimite entitled to habeas relief based on his decision not to testify. "[T]he ultimate decision regarding whether to testify belongs to the defendant," *Brown v. Artuz*, 124 F.3d 73 (2d Cir. 1997), and Caimite stated in court that he knew about his right to testify and that he did not wish to do so. Trial Tr. at 419. Moreover, Caimite has failed to establish a reasonable probability that, if he had testified, the result of the trial would have been different; had Caimite

testified, the prosecutor would have been able to introduce Caimite's confession to police about his involvement in Joel's killing.[3]

Finally, trial counsel presented cogent arguments to support his request for charges on the lesser included offenses of manslaughter in the first degree and manslaughter in the second degree. In an extended colloquy with the court, counsel displayed nuanced understanding of the law applicable to this case, arguing that a reasonable view of the evidence supported that Caimite had acted recklessly and further arguing that, if the evidence did *not* support reckless conduct, the court should eliminate its instruction on depraved indifference murder. That the trial court ultimately denied counsel's requests does not render counsel's performance deficient.

### B. Employing an investigator

In addition to claiming that defense counsel's performance was inadequate during trial and at pre-trial hearings, Caimite further claims that he received ineffective assistance of counsel because "defense counsel did not employee [*sic*] an investigator to assist him with the case." Initial Habeas Petition, at p. 8B. Caimite claims that an "investigator would have interviewed most of the witnesses and found that the leading witnesses were family." Furthermore, according to Caimite, an investigator also would have discovered that Colin Hinds "was a long time

---

[3] After detectives took Caimite into custody at the 67th Precinct on June 26, 2000, and read him his Miranda rights, Pre-trial Hearing Tr. at 80-81, Caimite gave an oral confession that detectives memorialized in writing and that Caimite adopted by affixing his signature. *Id.* at 81-82. After signing the written confession, Caimite also gave a videotaped confession. *Id.* at 83. According to these confessions, Caimite got into a fight with Joel Worrell on March 11, 2000, a fight that began with a verbal altercation in a pool hall, *Id.* at 23, and that escalated into a physical confrontation outside on the street. *Id.* at 24-25. Caimite claimed that both men had guns, that Joel attacked him, and that he pushed Joel away. *Id.* at 24-25. According to Caimite, when Joel stepped back after being pushed, Caimite pulled out his gun, at which point Joel rushed at him, punching his face, busting his nose, and cutting his eye. *Id.* at 24-25. While Joel was hitting him, Caimite claimed that the gun went off, that he turned around and another round went off, and that the gun then fell to the ground. *Id.* at 25.

business associate of Joel Worrell," thus contradicting Hinds' claim at trial that "he did not know Worrell or defendant." *Id.* at pp. 8F, 8G. Caimite also argues that an investigator would have uncovered additional evidence impeaching Hinds' testimony, namely the potential testimony of Rodney Bellony, an individual who claims to have been near the crime scene on the day that Joel was shot. In a sworn affidavit submitted by Caimite, Bellony stated that, on the day of Joel's shooting, he heard a shot fired as he was walking from the pool hall. Bellony Aff. ¶ 2. Bellony further stated that, as he turned to see what had happened, Hinds came up to him, asked him what happened, and told him that he had also heard a shot. *Id.* According to Bellony, no one knew who the shooter was and, when Hinds saw that Joel had been shot, Hinds became angry because he and Joel were friends and were involved in "business together (drugs)." Bellony Aff. ¶¶ 2, 3.

According to the standards outlined by the Supreme Court in *Strickland*, the duty to investigate requires counsel "to make reasonable investigations or to make a reasonable decision that makes particular investigation unnecessary." *Strickland*, 466 U.S. at 691. The duty to investigate, however, does not "compel defense counsel to investigate comprehensively every lead or possible defense," and determining whether an investigation was reasonable requires "a careful examination of counsel's efforts on a case-by-case basis." *Wells v. Greiner*, 417 F.3d 305, 321 (2d Cir. 2005). Furthermore, to establish ineffective assistance on this basis, a petitioner must show that there is a reasonable probability that the outcome of the trial would have been different had counsel conducted a reasonable investigation. *See Shi v. Connolly*, 2007 WL 4380276 *21 (E.D.N.Y. 2007); *see also United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997).

In the present case, the performance of Caimite's counsel at trial indicates that he was well prepared and intimately familiar with the facts and circumstances of his client's case. Even assuming for the sake of argument that Caimite's trial counsel did fail to hire an investigator, Caimite has not established how this failure would have changed the outcome of his trial. The record indicates that many of the issues that Caimite claims an investigator would have discovered were issues already known to defense counsel. For example, the record indicates that defense counsel was well aware that Alexander, one of the State's key witnesses, knew the victim well. The issue came up at a pre-trial hearing, Pre-Trial Hearing Tr. 69, 87, and in the prosecutor's opening statement, Trial Tr. 16, and defense counsel argued in closing that Alexander's close relationship with the victim had improperly influenced Alexander's testimony. Trial Tr. at 445, 447. Similarly, Gerald Worrell's relationship with the victim was mentioned in the prosecutor's opening statement, Trial Tr. at 17, and defense counsel argued in closing that this relationship had clouded Gerald Worrell's recollection of the events surrounding the shooting, causing Gerald to erroneously add information that he had not shared with investigators closer to the time of the shooting. Trial Tr. at 437-38.

In addition, Caimite has failed to establish a reasonable probability that the outcome of his trial would have been different had an investigator uncovered Rodney Bellony's potential testimony that, according to Caimite, would have impeached Hinds' testimony.[4] As a preliminary matter, it is questionable whether Bellony's potential testimony would have

_____

[4] Caimite also suggests that Hinds was lying about the identity of the person with whom he was walking on March 11, 2000, because Hinds testified at trial that he was walking with his girlfriend, Michelle Warden, but testified before the grand jury that he was walking with his girlfriend Sherry. The record, however, suggests that Michelle Warden also went by the name Sherline Warden. *See* Police Report attached to Ex. I, State's Opposition to Defendant's 440 Motion to Vacate.

contradicted Hinds' testimony in a material way. Bellony's affidavit actually corroborates that Hinds was within earshot of the shooting. Furthermore, Hinds' testimony—that he walked past some men who were exchanging words, turned back toward the men after he heard a "pow," and saw one man attacking another—is not inconsistent with Bellony's statement that Hinds, immediately after the shooting, asked Bellony what had happened. Even if Bellony's testimony would have contradicted Hinds' testimony, as Caimite argues, there were two other eye witnesses who supported Hinds' version of events, and Bellony's testimony impeaches neither of those witnesses. Alexander, whose testimony identified Caimite as Joel's assailant, was the centerpiece of the prosecutor's closing arguments, Trial Tr. at 461-63, and his testimony that Caimite was wearing a dark jacket, Trial Tr. at 42, was corroborated not only by Hinds but also by another eyewitness, Bono, who testified that the assailant was wearing dark clothing. Trial Tr. at 228. *See Schmidt*, 105 F.3d at 90 (finding that appellant had failed to establish prejudice because "[w]hatever the impact of this additional [evidence], the jury would necessarily have weighed it against the government's strong proof"). In sum, even assuming that trial counsel did not adequately investigate the case, Caimite has failed to show a reasonable probability that the outcome of his trial would have been different absent that error.[5]

### C. Plea bargaining

Caimite claims that he was denied the effective assistance of trial counsel because there is no "record of the defense counsel requesting to plea bargain for the defendant." Initial Habeas Petition, at p. 8B. "Although a defendant need not show that the negotiation of a plea bargain

---

[5] Even though trial counsel *did* impeach portions of Hinds' testimony, *see* Trial Tr. at 273-277, pointing out inconsistencies between Hinds' testimony before the grand jury and his testimony at trial, Trial Tr. 449-50, and pointing out that Hinds did not attempt to identify Caimite in court, the jury nevertheless convicted Caimite.

would have been successful, the strategy must nevertheless possess sufficient substance to be a viable alternative." *Eisemann v. Herbert*, 401 F.3d 102, 109-110 (2d Cir. 2005) (internal quotation marks and citations omitted). "[T]he failure to obtain a plea bargain is not evidence of ineffective assistance of counsel when the record does not contain evidence that one might have been offered." *Id.* (internal quotation marks omitted). Here, Caimite and the State agree that the prosecutor was not receptive to plea bargaining overtures.[6] And Caimite fails to identify any circumstances suggesting he had something to offer the prosecution that might affect its position, *e.g.*, an ability to testify against another, or even willingness to accept a sentence high enough to be acceptable to the prosecution. *Cf. United States v. Williams*, 372 F.3d 96, 107 (2d Cir. 2004) (finding pre-trial counsel ineffective for failing to seek a plea agreement in a situation where many of defendant's co-defendants obtained cooperation agreements in exchange for reduced sentences and defendant could have offered valuable information about the location of a co-defendant who had not yet been apprehended). In sum, Caimite has failed to establish either a lapse of representation or how he was prejudiced by his trial counsel's alleged inaction.

**D**. **Grand jury charging request**

Caimite's claim that trial counsel was ineffective for failing to ask the prosecutor to instruct the grand jury about the lesser included offense of manslaughter is also without merit. A prosecutor is not required under New York law to instruct the grand jury on lesser included

---

[6] Caimite stated, in both his § 440 application in state court and his habeas petition in this court, that "the people [*i.e.*, the State] made it very clear, they were not interested in plea bargaining." Initial Petition at p. 8F; Defendant's Memo in Support of 440 Motion, Ex. H, at p. 7. Additionally, the assistant district attorney represented in her opposition to Caimite's § 440 motion that, "[t]he record and files of the District Attorney's Office indicate that the prosecution refused to offer any plea bargain to defendant in the instant case." State's Memo. in Opposition to Def. § 440 Motion, Ex. I, at p. 9.

offenses. *People v. Delaney*, 125 Misc.2d 928, 929 (Sup. Ct., Suffolk Cty. 1984), *citing People v. Valles*, 62 N.Y.2d 36, 39 (1984). Accordingly, even if trial counsel in this case had requested that the prosecutor instruct the grand jury on lesser included offenses, the prosecutor would not have been required to grant such a request. Furthermore, the prosecutor's objection at trial to defense counsel's request for an instruction on lesser included offenses, and the trial court's denial of defense counsel's request, suggest that a request to submit such instructions to the grand jury would not have been successful. In sum, Caimite has failed to establish that he was prejudiced by counsel's alleged failure to make such a request.

## III. Trial Court's Charging Decisions

Caimite also argues that he was deprived of his due process rights because the trial court refused to instruct the jury that it could consider first-degree manslaughter as a lesser included offense. Although the Supreme Court has held that due process requires a trial court to submit jury instructions regarding lesser-included offenses in capital cases, the Court has expressly declined to consider whether such a requirement applies in a non-capital context. *Beck v. Alabama*, 447 U.S. 625, 638 & n. 14 (1980). As "a decision interpreting the Constitution to require the submission of instructions on lesser-included offenses in non-capital cases would involve the announcement of a *new* rule," *Jones v. Hoffman*, 86 F.3d 46, 48 (2d Cir. 1996) (per curiam) (emphasis added), the Second Circuit has held that federal habeas courts are precluded from considering the propriety of a state court's charging decisions in this context. *Id.*; *accord Carey v. Musladin*, 127 S.Ct. 649, 653 (2006) ("In *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), we explained that 'clearly established Federal law' in § 2254(d)(1) 'refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time

of the relevant state-court decision'"").   Accordingly, the state court's charging decision does not provide a basis for federal habeas relief in this case.

## IV.     Ineffective Assistance of Appellate Counsel

Caimite next argues that his appellate counsel was ineffective for failing to challenge his conviction of depraved indifference murder, N.Y. PENAL LAW § 125.25(2), on the ground that the evidence at trial demonstrated an intentional murder, and not a reckless killing under circumstances evincing a depraved indifference to human life.   The *Strickland* standards, discussed earlier in the context of Caimite's claim of ineffective assistance of trial counsel, also apply to a claim of ineffective assistance of appellate counsel.   *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994).

"Counsel is not required to forecast changes in the governing law," *Id.*, and courts should "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."   *Strickland*, 466 U.S. at 690.   At the time that Caimite filed his appeal in the Appellate Division, New York law regarding depraved indifference murder was reflected by *People v. Sanchez*, 98 N.Y.2d 373 (2002) and *People v. Register*, 60 N.Y.2d 270 (1983).[7]   *Policano v. Herbert*, 7 N.Y.3d 588, 594 (2006).   Under *Sanchez* and *Register*, to support a conviction for depraved indifference murder, the State was required to show that "defendant (1) recklessly engaged in conduct (2) which created a grave risk of death to another person (3) thereby causing the death of another person (4) under circumstances evincing a depraved indifference to human life."   *Policano*, 7 N.Y.3d at 602.

---

[7]   Petitioner's appellate brief was undated, *see* Ex. C, but appellate counsel's affidavit states that she submitted her appellate brief in February 2003.   *See* Ex. X.   In response to petitioner's appellate brief, the State submitted an appellate brief on March 27, 2003.

"[W]here both intentional and depraved indifference murder were charged in one-on-one shootings or knifings, these counts were submitted to the jury for it to sort out the defendant's state of mind unless there was absolutely no evidence whatsoever that the defendant might have acted unintentionally." *Policano*, 7 N.Y.3d at 600-601. Moreover, under the law at that time, "the very facts establishing a risk of death approaching certainty and thus presenting compelling circumstantial evidence of intent—for example, a point-blank shooting of the victim in the head—likewise demonstrated depraved indifference." *Policano*, 7 N.Y.3d at 601.

Faced with the law as it then existed, appellate counsel chose not to argue that the killing—a gunshot to the chest at close range—was consistent only with intentional murder and therefore insufficient to establish depraved indifference murder. Ex. X, Affidavit of Appellate Counsel, ¶ 6. Because the law, at the time that appellate counsel submitted her brief to the Appellate Division, supported a conviction for depraved indifference murder even in scenarios that involved point blank shootings, Caimite's appellate counsel was not constitutionally ineffective for deciding not to raise this issue.

Several months after appellate counsel submitted her brief, and only six days before the Appellate Division issued its decision denying Caimite's appeal, the New York Court of Appeals decided *People v. Hafeez*, 100 N.Y.2d 253 (2003). The Court of Appeals in *Hafeez* overturned a defendant's depraved indifference conviction where the defendant's conduct, though consistent with intentional murder, did not show "the 'heightened recklessness' required for depraved indifference murder." *Id.* at 258-59. Although it was the first case in the incremental "evolution of [the New York Court of Appeal's] depraved indifference jurisprudence away from *Register* and *Sanchez*," *Policano*, 7 N.Y.3d at 602, *Hafeez* did not overrule *Sanchez* or *Register*. Distinguishing its decision in *Sanchez*, the *Hafeez* Court noted that, unlike the *Sanchez* defendant

who had shot his adult victim by firing "into an area where children were playing, presenting a heightened risk of unintended injury," the defendants in *Hafeez* isolated their victim in an attack planned months in advance and directed their stabbing *solely* at the victim. *Id.* at 258-259. Whereas the State had shown that the *Sanchez* defendant's acts amounted to depraved indifference murder because they were "imminently dangerous and presented a very high risk of death to *others*," *Hafeez*, 100 N.Y.2d at 259 (emphasis added), that burden was not met in *Hafeez. Id.*

As in *Sanchez*—and unlike *Hafeez*—the evidence at Caimite's trial established that Caimite pulled a gun and shot at his victim while several innocent bystanders stood nearby. Caimite fired shots on a public street in the early evening, around 5:30 p.m., causing at least one bystander to flee. Believing that Caimite's case was factually distinguishable from *Hafeez*, Appellate Counsel's Affidavit, ¶ 6, appellate counsel did not file supplemental briefing with the Appellate Division after that decision was issued. Viewing the facts and the law at the time of appellate counsel's conduct without the benefit of hindsight, appellate counsel was not constitutionally ineffective in deciding to focus on other arguments instead of filing a supplemental brief arguing that Caimite's actions were analogous to the defendant's conduct in *Hafeez*.

Although New York law subsequently evolved to the point that "a one-on-one shooting or knifing (or similar killing) can almost never qualify as depraved indifference murder," *Policano*, 7 N.Y.3d at 601, *quoting Payne*, 3 N.Y.3d at 272, the New York Court of Appeals has made clear that changes in New York's depraved indifference law are not to be applied retroactively on collateral review and that "nonretroactivity poses no danger of a miscarriage of justice." *Policano v. Herbert*, 7 N.Y.3d 588, 604 (2006). Indeed, "retroactive application would

potentially flood the criminal justice systems with . . . motions to vacate convictions of culpable intentional murderers who were properly charged and convicted of depraved indifference murder under the law as it existed at the time of their convictions." *Id.* Accordingly, Caimite is not entitled to retroactive application of the changes in New York's law with regard to depraved indifference murder.[8]

---

[8] The New York Court of Appeals recently held that the changes in the law of depraved indifference murder outlined in *People v. Feingold*, 7 N.Y.3d 288 (2006), should apply to defendants who were convicted prior to the change in the law but whose convictions are pending on *direct* appeal. *People v. Jean-Baptiste*, -- N.Y. -- (2008). This does not alter, however, the Court of Appeals' instruction that changes in the depraved indifference murder jurisprudence "should not be applied on *collateral* review to defendants whose convictions became final prior to our new interpretation of the law of depraved indifference murder." *Id.* (emphasis added). In the present case, Caimite seeks *collateral* review of the state court's decision that denied his writ of error *coram nobis*. Furthermore, Caimite's conviction became final on October 20, 2003, 90 days after the Court of Appeals denied leave to appeal the Appellate Division's decision affirming Caimite's conviction on direct appeal. Accordingly, Caimite is not entitled to retroactive application of any change in depraved indifference murder law rendered by the Court of Appeals' decisions in *People v. Payne*, 3 N.Y.3d 266 (2004); *People v. Gonzalez*, 1 N.Y.3d 464 (2004); *People v. Suarez*, 6 N.Y.3d 202 (2005); or *People v. Feingold*, 7 N.Y.3d 288 (2006). Finally, it is important to note that Caimite did not raise the depraved indifference murder issue on direct appeal and, therefore, Caimite argues only that his appellate counsel was constitutionally ineffective for failing to raise it. Whether counsel was ineffective for failing to forecast a change in the law of depraved indifference murder, as discussed above, presents a somewhat different inquiry from whether there was, in fact, sufficient evidence to support a conviction for depraved indifference under the subsequently changed law.

**CONCLUSION**

For the reasons outlined above, Caimite's petition for a writ of habeas corpus is denied.

Since petitioner has failed to make a substantial showing of the denial of a constitutional right, a

certificate of appealability is denied pursuant to 28 U.S.C. § 2253(c).


**SO ORDERED.**


_____
                    _/s/_
**NINA GERSHON**
**United States District Judge**


**Dated:** **Brooklyn, New York**
            **February 2, 2009**